Filed 3/3/15  P. v. Arevalo CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059854 |
| v. | (Super.Ct.No. FVA701999) |
| JAIME AREVALO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Ingrid Adamson Uhler, Judge.  Affirmed with directions.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Robin Urbanski and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Jaime Arevalo of the second degree murder of Adrian Rivas (count 1; § 187, subd. (a)),[1] the premeditated and deliberate attempted murder of Gerardo Pizarro (count 2; §§ 664, 187, subd. (a)), and assault with a semiautomatic firearm upon Michael Thirkill (count 5; § 245, sub. (b)).[2] The jury additionally found true allegations defendant had personally used a firearm in counts 1, 2, and 5 (§ 12022.53, subds. (b) & (e)(1)); personally and intentionally discharged a handgun in his commission of the offenses in counts 1, 2, and 5 (§ 12022.5, subds. (a) & (d)); and personally and intentionally discharged a handgun causing death and great bodily injury in his commission, respectively, of the offenses in counts 1 and 2 (§ 12022.53, subds. (d) & (e)(1)). The court sentenced defendant to an aggregate term of 10 years 4 months incarceration plus an indeterminate term of 65 years to life.

On appeal, defendant contends the court committed prejudicial error in permitting the prosecution to impeach defendant and his uncle with one of their prior misdemeanor convictions. Defendant additionally argues clerical errors in the abstract of judgment and sentencing minute order must be corrected. The People concede the latter issue. We shall direct the superior court to correct the abstracts of judgment and conviction and sentencing minute orders. In all other respects, the judgment is affirmed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The jury found defendant not guilty of the alternatively pled counts 3 and 4, respectively, assault with a semiautomatic firearm upon Pizarro and the attempted premeditated and deliberate murder of Thirkill.

FACTUAL HISTORY

Raul Martinez, who sometimes went by the nickname "Racoo," testified that on November 12, 2005, he arrived at a house party hosted by Rivas's cousin, across the street from Eisenhower High School (Eisenhower) in Rialto at around 5:00 or 6:00 p.m. Somewhere between 80 and 500 people attended. Martinez was in the backyard when someone told him people were arguing in the front. He went to the front of the house to see what was happening. Rivas was speaking with several people in the street. Martinez recognized defendant's voice.

Martinez had attended Eisenhower with defendant for a short period of time. He also attended Eisenhower with defendant's brother. At the time of the shooting, Martinez had known defendant for a year or two. Defendant was Martinez's friend.

Defendant pulled out a small black handgun and began shooting. He fired five or six shots. Rivas was hit by gunshot in the head. Two other people were also shot. Rivas fell to the ground.

Martinez told a responding police officer, Lamont Quarker, Martinez saw defendant run from the scene after the shooting. That evening, Martinez picked defendant out of a photographic lineup. In 2007, Martinez again picked defendant out of a photographic lineup. Martinez identified defendant in court.

Adrian Badial testified he was at his cousin's house in front of Eisenhower for a party on November 12, 2005, when Rivas was murdered. Three to four people, including Rivas and Thirkill, were shot. Badial knew defendant, but did not see him at the party

3

and did not witness the shooting. However, Badial told Detective James Mills that Badial had seen defendant running from the scene of the shooting.

On an occasion prior to the shooting in 2005, defendant had shown up at Badial's mother's house. Defendant pounded on the door exclaiming that he wanted his gun back. Rivas was also present. They did not know anything regarding defendant's gun. Badial and Rivas beat defendant.

Thirkill testified he was at the party the night the shooting took place. Four men were monitoring the gate to ensure only invited guests were admitted. When Thirkill left the party to walk a friend to his car, the four individuals who were previously monitoring the gate were surrounding someone in the middle of the street. They were talking to the individual as if they were going to fight with him. They were telling the lone individual to leave. One of them swung what appeared to be a bottle; the surrounded individual started shooting a handgun.

Thirkill ran and ducked behind a vehicle. He heard about seven gunshots coming from the middle of the street and saw muzzle flashes. Thirkill felt a burning sensation and discovered he had been shot in the buttocks. He dug the bullet out and dropped it on the ground.

The man in the street that had been holding the bottle had been shot in the head. He fell backward to the ground where he lay with blood flowing out of his head. Thirkill saw another person shot in the stomach. Thirkill was later treated by paramedics, but chose not to go to the hospital. In May 2010, Thirkill identified defendant as the shooter from a photographic lineup.

4

Pizarro's preliminary hearing testimony was read into the record because he had died by the time of the trial. He had testified that he was at a party in Rialto where he received a grazing bullet wound to his leg while standing in the driveway. Pizarro was taken to the hospital where he spent eight hours.

Quarker testified he was dispatched to the residence at around 11:00 p.m. in response to a reported fight. When he arrived, he saw people kneeling around a person lying on the ground, with a large pool of blood around his head; it appeared the man had been shot in the head. The victim appeared to still be breathing so Quarker called the paramedics.[3] Quarker asked what had happened; he was told that Rivas had been shot.

Four or five other officers responded to Quarker's call for backup. The paramedics arrived, treated Rivas, and took him to the hospital.

Quarker spoke with Badial, who told Quarker he saw defendant arguing with another man in the middle of the street in front of the house. Rivas was attempting to stop defendant from fighting with the other individual. Badial said he then heard several gunshots, ducked down, and saw defendant running away.

Sergeant Joshua Lindsay also spoke with Badial, who said defendant was at the party and was one of the men arguing. Rivas stepped between defendant and another arguing party. The shooting then occurred. Badial did not see the shooter; however, he saw defendant running away afterward. Badial identified defendant from a photographic lineup.

_____

[3] Though Quarker did not testify this victim was Rivas, it is apparent from the record as a whole that he was.

Badial was able to provide Quarker with directions to defendant's address. It was with that information that other officers were able to provide Quarker with the photographic lineup containing defendant's picture, from which Martinez, Badial, and Thirkill identified defendant.

Quarker spoke with Martinez, who said he witnessed an argument in the street between Pizarro and defendant. Martinez said defendant pulled out a dark handgun and fired five or six rounds toward Pizarro.

Mills was assigned to investigate and process the scene of the shooting. He found six spent, nine-millimeter shell casings. Mills also discovered two bullet strikes to two vehicles parked on the curbside. Thirkill came up to Mills and informed him Thirkill had been shot in the buttocks. Thirkill described the shooter. Mills was with Lindsay when Lindsay spoke with Badial; Badial identified defendant as being at the party.

An emergency room physician testified that on November 13, 2005, he treated Pizarro for a gunshot wound to Pizarro's right leg. The injuries "were significant and potentially disastrous." Pizarro was released the same day.

Rivas died on November 15. A retired medical examiner performed the autopsy on Rivas' body. He testified Rivas had sustained three gunshot wounds. The cause of Rivas' death was multiple gunshot wounds.

Mills interviewed Martinez on December 6 and 9, 2007, at the Adelanto Jail. Martinez informed Mills that Martinez witnessed an argument between Rivas and defendant, in which Rivas was telling defendant that defendant could not attend the party.

6

Defendant looked angry and did not appear intoxicated. Mills confirmed that defendant had attended Eisenhower with Martinez, albeit, only for three days.

Fidel Gutierrez testified he knew defendant in 2005 and considered him a friend. In January 2008, he received phone calls from defendant while defendant was in jail. The calls were recorded, burned to a CD, and provided to the People. The People played a recording of one of the calls to the jury.

In the call, defendant tells Gutierrez to inform "Racoo," "You fucked up homie. But, we ain't trippin yet. What you got to do is testify in court and say that you lied. That you just wanted to get out of jail so you said it was him, you know." "And then just be like, if you don't do that then after that, you know what I'm saying, then you and your whole fam bams is gonna . . . get murked. Then that Fool, he, he's a little bitch dog, he'll, he'll do what you tell him." "[E]ither he pays or you know what I'm sayin'? He knows what the consequences . . . ." Gutierrez interrupted, "He pays or he lays." To which defendant replied, "Exactly." Gutierrez testified he recognized his own and defendant's voices from the recordings.

Defendant's uncle, Leo Carrillo, testified that in July 2005, defendant came to live with him in Tijuana, Mexico. Defendant lived with him for somewhere between 11 and 18 months. In November 2005, in the middle of the week, around defendant's birthday on the tenth, defendant went out with his friends to celebrate. On November 12, 2005, the family celebrated defendant's birthday in Tijuana from noon until midnight.

7

Defendant's grandmother testified defendant lived with Carrillo in Tijuana beginning in the spring of 2005 until March 2006. The family celebrated defendant's birthday on November 12, 2005, in Tijuana, from the afternoon until midnight.

Defendant testified he began living with Carrillo in Tijuana around June 2005 for about a year. Defendant was living with Carrillo on defendant's birthday in November 2005. The family came down to celebrate on November 12, 2005.

Defendant testified he was in Tijuana on the night of the shooting. He was not at the party. Defendant did not shoot or kill anyone. He never fought with Badial or Rivas.

Defendant did not know Badial, Rivas, Martinez, Thirkill, or Pizarro. Defendant only attended Eisenhower for one day. When defendant referred to "Racoo," he meant to give two black eyes to the person who had inculpated him; "Racoo" did not refer to any specific individual known to him other than the person who was lying to the police about defendant having been the shooter. Defendant also testified Martinez and "Racoo" were the same person, but that he was not referring to Martinez when he mentioned "Racoo" in his recorded conversation. Defendant testified that getting "murked" meant "pure danger," but is not a threat to kill anyone.

## DISCUSSION

A. Impeachment with Misdemeanor Convictions.

Defendant contends the court prejudicially erred in allowing the People to impeach both defendant and Carrillo with one of their prior misdemeanor convictions. We disagree.

8

Defendant filed a pretrial brief seeking to exclude the use of defendant's prior convictions to impeach his testimony. The court noted, "Now we have, again, just so we can kind of clear up some things, in terms of motions to exclude priors, that would be only litigated assuming your defendant intends to take the witness stand, so we can go over that prior . . . as to any type of prior convictions." The court added, "My understanding under Wheeler and other case authority is that the conduct can come in but only if, obviously, the People have witnesses to establish that conduct and it has to involve moral turpitude, obviously. So that would be a—sometimes it's a very difficult bridge to cross when you don't have the actual witnesses to that actual misconduct."

In the middle of trial, the People proposed impeaching Carrillo's testimony with an April 1, 1996, misdemeanor conviction for theft of personal property; a March 31, 1997, misdemeanor conviction for theft; and a March 25, 1999, felony conviction for petty theft with a prior. Defense counsel conceded the felony conviction could be adduced, but objected to "misdemeanors coming in unless—even if [the prosecutor] was preparing to bring in witnesses, I think it would take undue time to prove up the facts of the misdemeanor thefts."

The court responded, "That's not required any longer. In terms of a misdemeanor versus felony, in terms of the prior convictions, the actual conduct does not have to come in any more to substantiate the misconduct on a misdemeanor. It's treated exactly like a felony conviction, I think, under the Wheeler decision, and I believe there's a specific Evidence Code section dealing with that, so that's a non issue at this time." The court determined that the crimes were not too remote in time and established "a pattern and

9

history of theft-related offenses from 1996 [through] 1999, which, obviously, is very relevant to the credibility of a witness in terms of the fact that they were all theft-related, then I would be inclined to allow all these convictions to come in."

Defense counsel objected based on the length of time since the convictions. The court asked if Carrillo had been law abiding since his last release from prison. The People responded he had an arrest on March 12, 2012, for driving under the influence, but there was no conviction and no indication whether the arrest was for a misdemeanor or felony. The court stated, "Well, I'm going to take it under submission. I'll do a little more research. I know that the courts have a greater latitude in terms of prior convictions being used for impeachment purposes . . . ." The court also took the issue of the remoteness of the convictions under submission.

After further trial testimony, the court stated, "My tentative indicated ruling is that I am going to allow your witness to be impeached with the prior convictions involving moral turpitude, even though they occurred, I believe, in 1996 [through] 1999." "One of the most important factors is to consider whether or not the convictions reflect honesty. And, again, since these are theft-related convictions that strictly are reflecting on honesty and veracity, I'm going to allow . . . the witness to be impeached with those prior convictions. And that would be Les Carrillo for the record."

During Carrillo's testimony, the People impeached him with only one of his misdemeanor convictions, his conviction for theft in 1996. The People also impeached defendant with his felony conviction in 1999 for theft. During defendant's testimony on cross-examination, the People asked if defendant had been convicted of attempted second

10

degree burglary in March 2007.  Defendant testified he did not remember.  The court took judicial notice that defendant had been convicted of misdemeanor attempted second degree burglary on March 9, 2007.

"[I]f past criminal conduct amounting to a misdemeanor has some logical bearing upon the veracity of a witness in a criminal proceeding, that conduct is admissible, subject to trial court discretion . . . ."  (*People v. Wheeler* (1992) 4 Cal.4th 284, 295.) "Misconduct involving moral turpitude may suggest a willingness to lie [citations], and this inference is not limited to conduct which resulted in a felony conviction.  While the trial court may weigh proffered impeachment evidence on its individual merit, there is no basis for a ruling that the court's discretion may never be exercised to admit nonfelonious conduct."  (*Id*. at pp. 295-296.)  "In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony.  Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present.  Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value."  (*Id*. at pp. 296-297, fn. omitted.)

"[E]vidence of a misdemeanor *conviction,* whether documentary or testimonial is inadmissible hearsay when offered to impeach a witness's credibility."  (*People v. Wheeler*, *supra*, 4 Cal.4th at p. 300, fn. omitted.)  "Nothing in the hearsay rule precludes proof of impeaching misdemeanor misconduct by other, more direct means, including a witness's admission on direct or cross-examination that he or she committed such

11

conduct. Nor is the Legislature precluded from creating a hearsay exception that would allow use of misdemeanor conviction for impeachment in criminal cases." (*Id*. at p. 300, fn. 14.)

"In 1996, the Legislature enacted Evidence Code section 452.5, which provides the type of hearsay exception contemplated in *Wheeler*. Evidence Code section 452.5, subdivision (a) provides that the official records of which a court may take judicial notice (Evid. Code, § 452, subd. (d)) include certain computer-generated official court records. Evidence Code section 452.5, subdivision (b), the provision more directly pertinent to the question before us, states, 'An official record of conviction certified in accordance with subdivision (a) of Section 1530 is admissible pursuant to Section 1280 *to prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record*.'" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1460.)

"Evidence Code section 452.5 states a new hearsay exception for certified official records of conviction, which may be offered to prove not only the fact of a conviction, but the commission of the underlying offense." (*People v. Duran*, *supra*, 97 Cal.App.4th at p. 1461, fn. omitted.) However, an attempt to impeach a defendant by eliciting testimony about a prior conviction is a form of evidence still not excepted from the hearsay rule. (*People v. Cadogan* (2009) 173 Cal.App.4th 1502, 1515, fn. 4; accord, *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1522, fn. 8; but see *People v. Capistrano* (2014) 59 Cal.4th 830, 866-867 [trial court committed harmless error in precluding counsel from questioning a witness as to whether she had committed misdemeanor

12

offenses as she was a percipient witness to her own crimes]; *People v. Farley* (2009) 46 Cal.4th 1053, 1105 [same].)

Here, the People's elicitation of Carrillo's misdemeanor conviction for theft would appear to be an impermissible violation of the rule against hearsay evidence. Likewise, the People's attempted elicitation of defendant's misdemeanor conviction for attempted second degree burglary would appear to have been an impermissible violation of the rule against hearsay evidence had it been successful. However, defendant's misdemeanor conviction was properly adduced through the court's judicial notice of defendant's conviction from court records.

Regardless, any error in the admission of either witness's misdemeanor convictions was harmless under any standard. (*People v. Capistrano*, *supra*, 59 Cal.4th at p. 867; *People v. Farley*, *supra*, 46 Cal.4th at p. 1105.) The elicitation of Carrillo's misdemeanor conviction for theft in 1996 was brief and of an extraordinarily minor prejudicial nature. Likewise was the court's judicial notice of defendant's misdemeanor conviction for attempted second degree burglary. It is somewhat incongruous, and not altogether clear, that the law finds it prejudicial to allow a witness to simply admit he had been convicted of a misdemeanor offense involving moral turpitude, while allowing the establishment of the misdemeanor conviction through documentary evidence or descriptions of the offenses by the witness himself. In any event, the evidence, as recounted in our factual background above without the impeachment evidence, overwhelmingly established that defendant was not in Mexico at the time of the shooting. Rather, the evidence overwhelmingly established defendant was the shooter.

13

Martinez was defendant's friend for up to two years before the shooting. He identified defendant as one of the men in the street engaged in an argument prior to the shooting. He identified defendant as the shooter on four separate occasions: (1) at the scene; (2) that evening from a photographic lineup; (3) out of a photographic lineup in 2007; and (4) in court. Martinez saw defendant running from the scene of the shooting.

Badial told one officer he had seen defendant at the party. Badial told two other officers defendant was one of the men arguing in the street immediately before the shooting. Badial saw defendant run from the scene of the shooting. Badial identified defendant from a photographic lineup. Thirkill identified defendant from a photographic lineup. Thus, overwhelming direct evidence established that defendant was at the scene of the shooting and not in Mexico. Any error was harmless beyond a reasonable doubt.

Moreover, the credibility of the three witnesses who identified defendant at the scene must be compared with that of defendant, of which the court noted, "Throughout all the years I've been a bench officer, in terms of [defendant's] testimony, it was the most incredible testimony that's ever been heard in terms of how [defendant] testified, in terms of some of the statements [defendant] made that obviously were lies . . . ." The court's summation of defendant's testimony is amply supported even on this cold record. Defendant himself made prejudicial statements during his testimony. Defendant spontaneously admitted he had been a marijuana dealer. Defendant divulged that he was high on cocaine when interviewed by police. Any error was harmless.

14

B.  Clerical Errors.

Defendant contends the sentencing minute order and abstract of judgment erroneously reflect the court sentenced defendant for the count 3 offense on which the jury found him not guilty.  Defendant further notes the abstracts of judgment erroneously reflect the offenses occurred in 2013 rather than 2005.  The People concede the abstracts of judgment and sentencing minute order must be corrected to accurately reflect the record. We agree.

"To the extent a minute order diverges from the sentencing proceedings it purports to memorialize, it is presumed to be the product of clerical error.  [Citation.]  . . .  As with other clerical errors, discrepancies between an abstract and the actual judgment as orally pronounced are subject to correction at any time, and should be corrected by a reviewing court when detected on appeal.  [Citation.]"  (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324; accord *People v. Contreras* (2009) 177 Cal.App.4th 1296, 1300, fn. 3.)

Here, the sentencing minute order dated August 23, 2013, and one of the abstracts of judgment, erroneously reflect the court imposed but stayed sentence on the Count 3 offense, an offense of which the jury found defendant not guilty.  Likewise, both abstracts of judgment reflect the offenses occurred in 2013 rather than 2005, as established by the evidence at trial.  Furthermore, undiscussed by the parties, the minute order of the conviction dated February 15, 2013, erroneously reflects the jury found defendant guilty on count 3.  We shall direct the superior court to correct the minute orders and abstracts of judgment.

15

DISPOSITION

The superior court is directed to correct the minute order dated February 15, 2013, to reflect that the jury found defendant not guilty on count 3.  The superior court is further directed to correct the minute order dated August 23, 2013, and the corresponding abstract of judgment, to accurately reflect that defendant was not convicted or sentenced on the count 3 offense.  Finally, the superior court is directed to correct the abstracts of judgment to reflect that all the offenses of which defendant was convicted occurred in 2005, not 2013.  The corrected abstracts of judgment and minute orders shall be forwarded to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


KING
Acting P. J.


MILLER
J.

16